UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| CURTIS NUNEZ, JR., | No. 2: 12-cv-2775 JAM KJN P |
|---|---|
| Plaintiff, | |
| v. | ORDER AND FINDINGS AND RECOMMENDATIONS |
| K.M. PORTER et al., | |
| Defendants. | |

I. Introduction

Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is defendant's motion for summary judgment. (ECF No. 95, 77.) Also pending is plaintiff's motion to file an amended opposition. (ECF No. 98.) The undersigned construes this pleading as a motion to file a supplemental opposition. Defendant did not oppose this motion. Good cause appearing, plaintiff's motion is granted.

After carefully considering the record, the undersigned recommends that defendant's summary judgment motion be granted.

II. Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)).

"Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on January 3, 2013 (ECF No. 12), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (*en banc*); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

III. Plaintiff's Claims

This action proceeds on the original complaint against defendant Correctional Sergeant Porter.[1] Plaintiff alleges that defendant Porter retaliated against him for assisting another inmate with legal matters by filing three false disciplinary charges against plaintiff.

In particular, the complaint alleges that while plaintiff was housed at California State Prison-Sacramento ("CSP-Sac"), in the Correctional Treatment Center ("CTC"), plaintiff served as Chairman of the "Men's Advisory Counsel" (sic) ("MAC"), and was recognized as "Prisoner Laymen" (sic), known for his legal skills. (ECF No. 1 at 3-4.) Plaintiff alleges that inmate Giraldes, also housed in the CTC, "requested that plaintiff raise the issue of obtaining the Antenna Wall Cable System for the inmates housed in the CTC at a Warden's Meeting so they could receive regular [programming] over the air channels." (Id. at 3.)

When the administrative request to the warden proved unsuccessful, plaintiff assisted Giraldes in filing a related civil action. (Id. at 3-4.) Allegedly in retaliation for this advocacy, defendant Porter authored three allegedly false disciplinary "write-ups" against plaintiff. (Id. at 4.)

IV. Legal Standards for First Amendment Retaliation Claim

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote and citations omitted).

Under the first element, plaintiff need not prove that the alleged retaliatory action, in itself, violated a constitutional right. Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995) (to prevail on a retaliation claim, plaintiff need not "establish an independent constitutional interest" was violated); see also Hines v. Gomez, 108 F.3d 265, 269 (9th Cir. 1997) ("[P]risoners may still

---

[1] The claims against defendants Till, Norton and Caraballo were dismissed on the grounds that plaintiff failed to exhaust administrative remedies as to these defendants. (See ECF No. 64.)

4

base retaliation claims on harms that would not raise due process concerns."); Rizzo v. Dawson, 778 F.2d 527, 531 (9th Cir. 1985) (transfer of prisoner to a different prison constituted adverse action for purposes of retaliation claim). The interest cognizable in a retaliation claim is the right to be free of conditions that would not have been imposed but for the alleged retaliatory motive. However, not every allegedly adverse action is sufficient to support a claim for retaliation under § 1983. Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012) (harm must be "more than minimal").

To prove the second element, retaliatory motive, plaintiff must show that his protected activities were a "substantial" or "motivating" factor behind the defendant's challenged conduct. Brodheim v. Cry, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989)). Plaintiff must provide direct or circumstantial evidence of defendant's alleged retaliatory motive; mere speculation is not sufficient. See McCollum v. Cal. Dep't of Corr. and Rehab., 647 F.3d 870, 882–83 (9th Cir. 2011); accord Wood v. Yordy, 753 F.3d 899, 905 (9th Cir. 2014).

In addition to demonstrating defendant's knowledge of plaintiff's protected conduct, circumstantial evidence of motive may include: (1) proximity in time between the protected conduct and the alleged retaliation; (2) defendant's expressed opposition to the protected conduct; and (3) other evidence showing that defendant's reasons for the challenged action were false or pretextual. McCollum, 647 F.3d at 882 (quoting Allen v. Iranon, 283 F.3d 1070, 1077 (9th Cir. 2002)).

The third element includes prisoners' First Amendment right of access to the courts. Lewis v. Casey, 518 U.S. 343, 346 (1996). While prisoners have no freestanding right to a prison grievance process, see Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003), "a prisoner's fundamental right of access to the courts hinges on his ability to access the prison grievance system," Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995), overruled on other grounds by Shaw v. Murphy, 532 U.S. 223, 230 n. 2 (2001). Because filing administrative grievances and initiating civil litigation are protected activities, it is impermissible for prison officials to retaliate against prisoners for engaging in these activities. Rhodes, 408 F.3d at 567.

Under the fourth element, plaintiff need not demonstrate a "total chilling of his First Amendment rights," only that defendant's challenged conduct "would chill or silence a person of ordinary firmness from future First Amendment activities." Id. at 568–69 (citation and internal quotation marks omitted). Moreover, direct and tangible harm will support a retaliation claim even without demonstration of a chilling effect on the further exercise of a prisoner's First Amendment rights. Id. at 568 n.11. "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm" as a retaliatory adverse action. Brodheim, 584 F.3d at 1269 (citing Rhodes, 408 F.3d at 568 n.11).

Regarding the fifth element, the Ninth Circuit has held that preserving institutional order, discipline, and security are legitimate penological goals that, if they provide the motivation for an official act taken, will defeat a claim of retaliation. Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir. 1994); Rizzo, 778 F.2d at 532. When considering this final factor, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Pratt, 65 F.3d at 807 (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)). Plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for defendant's challenged conduct. Id. at 806.

V. Discussion

Defendant moves for summary judgment on the following grounds: 1) there was no causal connection between defendant's conduct and plaintiff's assistance to an inmate ; 2) defendant's conduct did not chill plaintiff's ability to perform his duties as a MAC representative; and 3) defendant's conduct advanced a legitimate penological goal. Defendant also argues that she is entitled to qualified immunity.

A. Did Defendant's Conduct Advance a Legitimate Penological Goal?

Defendant argues that she issued one 128-Chrono and two rules violation reports against plaintiff for the legitimate penological goal of enforcing the boundaries implemented by the prison. Defendant addresses this issue in her declaration submitted in support of the summary judgment motion:

////

2. In 2011, my duty assignment was in the Correctional Treatment Center (CTC) Facility. As a Correctional Sergeant, I am expected to monitor inmate conduct in my assigned Facility to ensure their compliance with prison regulations.

3. I am personally familiar with Inmate Curtis Nunez ("Inmate Nunez") as a result of my supervision of the Canteen area.

4. I first began having issues with Inmate Nunez when I noticed that inmates were hanging around the back window of the Canteen and speaking to him. I did not have any issues with Inmate Nunez prior to this Canteen issue.

5. The Canteen is located in the A Facility building where inmates can purchase personal items. There are two windows to the Canteen, a front and back window. Inmates can purchase items from the front window but cannot approach or purchase items from the back window because it is entirely blocked by a metal screen. Inmates are not allowed in or around the Canteen until called upon and must follow prison procedures in order to purchase items.

6. The entire Canteen area is out of bounds. The area around the back window of the Canteen is a restricted area reserved for staff members, including medical personnel, to walk to and from the facility building. This area is restricted to ensure that medical staff and medical personnel can safely travel from one side of the facility to another.

7. Inmates are strictly prohibited from entering the restricted out of bounds area because that creates a risk that inmates may physically harm staff or others. Inmates may only approach the front Canteen window when called upon, and can only do so one person at a time.

8. The out of bounds area is clearly marked with a bold, red line painted on the ground. A true and accurate picture of the red out of bounds line is attached here as Exhibit A.

9. The wall of the Canteen also displays a red-stenciled warning in large letters that reads "Out of Bounds." A true and accurate picture of this sign is attached here as Exhibit B.

10. The procedure for purchasing items from the Canteen is that inmates must stand in line within a yellow box that is painted on the ground until they are called to the front Canteen window, at which point the inmate at the front of the line can walk up to the front window, buy what he wants, and return to the other side of the red line. A true and accurate picture of the yellow boxed area and the red out of bounds line in front of the Canteen is attached as Exhibit C.

11. In 2011, while on duty, I began noticing inmates gathering around the back window of the Canteen, and they appeared to be speaking to Inmate Nunez, who was employed inside the Canteen. I knew that they were not purchasing items from the Canteen because the back window does not open, and the only window

7

Inmates can purchase items from is the front window. I do not know what the other inmates were discussing with Inmate Nunez. I repeatedly told the inmates to leave the area, which they did, only to find that when I walked away, they would return to the Canteen window again and continue talking to Inmate Nunez.

12. Prior to issuing a Rules Violation Report to Inmate Nunez, I issued him a 128-Chrono and verbally warned him that the back window of the Canteen was out of bounds and that he was supposed to be working the Canteen for his supervisor, not speaking with other inmates who were clearly not purchasing items from the Canteen. I ordered Inmate Nunez to stop talking to Inmates from the back window yet he did not comply.

13. At the time I was issuing Rules Violations to Inmate Nunez and other inmates for their unauthorized conduct in the Canteen area, I was not aware that Inmate Nunez was helping an inmate by the name of "Giraldes," with legal work. I did not know the content of Inmate Nunez's conversations with these inmates, when he met with them, which inmates were receiving help from the MAC representatives, let alone receiving help from Inmate Nunez specifically.

14. I wrote and issued Nunez a total of three formal write-ups. The first was a 128-Chrono, which is the equivalent of a warning, for being "out of bounds," and is dated May 10, 2011. A true and correct copy of this report is attached here as Exhibit D.

15. The second write-up was a Rules Violation for "out of bounds," log number A-11-07-002, dated July 11, 2011. This was eventually converted to a 128-B Chrono. A true and correct copy of this report is attached hereto as Exhibit D.

16. The third write-up was a Rules Violation for "Job Performance," log number A-11-08-003, dated August 8, 2011. This was eventually converted to a 128-Chrono. A true and correct copy of this report is attached hereto as Exhibit F.

17. All write-ups were issued as a result of Inmate Nunez's misconduct as the Canteen vendor.

18. I issued Rules Violation Reports to any inmate who was out of bounds, whether they were a MAC member or not, in an effort to enforce the prison's boundaries and prevent inmates from being in locations where they were not authorized to be.

19. In total, I issued "out of bounds" write-ups to at least fourteen inmates, not including Nunez. There were at least five other inmates who, just like Inmate Nunez, also received Rules Violations more than once for their unauthorized conduct at the back Canteen window.

20. The grounds for Inmate Nunez's first two write-ups, the 128-Chrono and the July 11, 2011 Rules Violation, was listed as "out of bounds" because that is the same violation I listed for the other

8

> inmates who were in a clearly marked out of bounds area, and plaintiff was the one who caused them to be there by communicating with them. I later learned that, technically, one of the Rules Violations for Nunez should have been classified as "job performance" or "failure to comply with an officer's direct orders" rather than out of bounds.
>
> 21. The final Rules Violation I issued to Inmate Nunez, dated August 8, 2011, was for "Job Performance," because he was supposed to [be] helping his Canteen supervisor. Instead I saw Inmate Nunez spend his Canteen duty time conversing with other inmates who were in the out of bounds area and who were clearly not purchasing items from the Canteen because it is impossible to sell items from the back window because it is blocked by a metal screen.
>
> 22. Once Inmate Nunez was terminated from his Canteen position, I had no further issues with him and he did not receive any more write-ups from me.
>
> \*\*\*\*

(ECF No. 77-6 at 1-4.)

Defendant has also provided the declaration of R. Carter, the former Facility Captain for A-Facility at CSP-Sac during the relevant time period. In relevant part, R. Carter states that the Canteen area is a restricted area that inmates are not permitted to be in. (ECF No. 77-5 at 2.) R. Carter states that defendant Porter properly issued the 128-Chrono and rules violation reports to plaintiff because inmates were not permitted to gather or engage in conversation in that area of the Canteen. (Id.)

Defendant has also provided the declaration of CSP-Sac Associate Warden Eldridge. Warden Eldridge states that the first rules violation issued by defendant Porter to plaintiff, i.e., number A-11-07-002, charged plaintiff with being "out of bounds." (ECF No. 77-4 at 2.) Associate Warden Eldridge states that these charges were dismissed because the circumstances of the offense did not meet the criteria for out of bounds. (Id.) However, Associate Warden Eldridge states that plaintiff violated prison regulations by using his Canteen assignment to speak to inmates about unknown matters and causing them to loiter in a restricted area. (Id.) "Yet, 'out of bounds' was not the proper rule applicable to his offense because he was authorized to be in the Canteen, thus he was not technically 'out of bounds.'" (Id.) Because the incorrect rule was applied to his offense, the Rules Violation was properly dismissed. (Id.)

9

Associate Warden Eldridge states that the second rules violation issued by defendant Porter was reduced to a 128-Chrono for "progressive discipline." (Id.) "'Progressive discipline' is a form of discipline that results in a change in the inmate's regular program in order to prevent the inmate from engaging in the same violative conduct." (Id.) Based on his review of the facts in this report, Associate Warden Eldridge states that "job performance" was the correct rule for plaintiff's offense, because he was using his Canteen assignment to engage in unauthorized communication with other inmates. (Id.)

The undersigned observes that the first rules violation report prepared by defendant Porter, i.e., no. 11-07-002, states that defendant Porter spoke to Canteen Manager Harmon "again" about not letting plaintiff talk to inmates out of the back window of the Canteen. (ECF No. 77-6 at 15.) The second rules violation report prepared by defendant Porter, i.e., no.11-08-003, states that defendant Porter had spoken several times over the past few months to Canteen Manager Harmon about not letting plaintiff talk to inmates out of the back window. (Id. at 18.) Defendant Porter wrote that Harmon told her that plaintiff did Canteen money checks for the inmates on the yard out of the back window, which (according to defendant) is a violation of current policy. (Id.)

The undersigned finds that defendant has met her initial burden of demonstrating that the issuance of the disciplinary write-ups to plaintiff advanced the legitimate penological goals of prison safety and security, and that defendant Porter was motivated to advance these goals when she issued the write-ups. The declarations of defendant Porter, R. Carter and Associate Warden Eldridge demonstrate that plaintiff's conduct of speaking to inmates out of the back window of the Canteen was not permitted because this area was "out of bounds" to inmates, for safety and security reasons.

The undersigned acknowledges that the rules violation reports indicate that Canteen Manager Harmon may have allowed plaintiff to conduct some Canteen business through the back window or even permitted plaintiff to converse with inmates through the back window regarding matters unrelated to his job. However, even if Canteen Manager Harmon allowed plaintiff to engage in conduct that violated prison rules, the evidence demonstrates that in issuing the disciplinary write-ups, defendant Porter was motivated to enforce the rules prohibiting inmates

10

from communicating behind the Canteen.

In addition, the fact that the rules violation report charging plaintiff with being "out of bounds" was dismissed does not undermine the finding that issuance of this rules violation report advanced the legitimate penological goals of safety and security. The evidence demonstrates that this write-up was dismissed on grounds that it was improperly labeled, not on grounds that the conduct alleged did not occur.

Defendant has also presented evidence demonstrating that plaintiff knew that his conduct violated prison rules. The progressive write-ups gave plaintiff notice that his conduct was not permitted. In addition, the third disciplinary write-up, i.e., 11-08-003, states that defendant Porter noticed a typewritten sign at the back window stating, "Do not approach or talk to the Canteen worker at this window Subject to a CDC-115 Per Sergeant Porter." (ECF No. 77-6 at 18.) Defendant Porter wrote in the Rules Violation Report that plaintiff put this sign on the inside of the Canteen back window after the hearing for the first rules violation. (Id.)

At his deposition, plaintiff testified that he put the sign on the back of the Canteen window at the direction of his supervisor, Canteen Manager Harmon. (Plaintiff's deposition at 50-51.) At his deposition, plaintiff was asked why he did not stop standing at the back of the Canteen window after the sign was put up. (Id. at 52.) Plaintiff responded, "That's the thousand dollar question right there."[2] (Id.)

For the following reasons, the undersigned finds that plaintiff has not met his burden of presenting evidence establishing that a genuine issue of fact exists as to whether issuance of the write-ups advanced legitimate penological goals.

Plaintiff does not dispute that he engaged in the conduct alleged in the chrono and rules violation reports. Plaintiff also does not dispute that his conduct violated prison rules. Plaintiff also does not dispute that the rules establishing the area behind the Canteen as out of bounds for

---

[2] Defendant also argues that the fact that she issued rules violations to fourteen inmates for being out of bounds supports her claim that she was not motivated to retaliate against plaintiff. Without more specific evidence regarding these rules violations, including when they were issued, the undersigned cannot consider them as evidence in support of defendant's argument that issuance of the write-ups advanced legitimate penological goals.

11

inmate promoted prison safety and security. Plaintiff's main argument for why issuance of the write-ups did not advance legitimate penological goals is that Canteen Manager Harmon gave him permission to communicate with inmates out of the back window of the Canteen. As previously discussed, the undersigned is not persuaded by this argument. Nevertheless, the undersigned addresses plaintiff's evidence submitted in support of this argument.

Attached as an exhibit to the supplemental opposition is a memorandum from defendant Porter to Captain Roth dated March 16, 2011. (ECF No. 98 at 5-6.) Defendant Porter wrote this memorandum before she issued plaintiff his first write-up on May 10, 2011. The memorandum states,

> I just wanted to bring to your attention that I have been noticing a lot of activity outside the A Facility Canteen run by Ms. Harmon. Just in the last two weeks, I've noticed that Ms. Harmon comes in every week day around 0700 hours. At that time, she calls in her worker Inmate Nunez (C-79747) AKA "Sapo" to work. Throughout the day, Ms. Harmon has her window open at random periods along the back window of the canteen open for Sapo to talk to inmates through it. All day long, there are inmates hanging at both windows just chatting with Harmon and Sapo not getting canteen. SNY yard is 1000-1400, both windows are always open and inmates seem to shop whenever daily or just hang on the window. The Canteen area is out of bounds because it is a walkway for staff. I've been running the inmates off the window only to return a few minutes later to find other inmates there. Yesterday March 15, 2011, I got tired of running the inmates off the window by late afternoon and stopped to explain to Harmon that inmates shouldn't be hanging on the window or the walkway. Harmon stated that she was new to A Facility and didn't know. This morning March 16, 2011, at approximately 0730 hours, I saw an inmate talking to someone inside the canteen window and called over to him. I asked him if he was getting canteen at 0730 hours and he said no, he was giving something to Sapo. When I walked to the window of the canteen, no one was at either window but both were wide open. I came back 10 minutes later and there was another inmate talking to someone inside the canteen. I asked him if he was getting canteen and he said "no a money check." When I looked in the window, Sapo had been talking to the inmate and Harmon was on the phone in the back room. I told Sapo he wasn't to be talking to everyone through the window and to shut it. Sapo said, "She just got a call and we are running canteen and she talked to that captain yesterday about you so talk to her." Sapo walked to the back window. I waited till Harmon was off the phone, asking her why the window had been opened up already this morning. Harmon stated, "I was doing a money check and the phone rang. I talked to the captain yesterday and I can have guys on the window and that's where they stand to get canteen," pointing to the walkway. I explained that only one inmate is to be at the window at

12

> a time and the rest behind the red line. The canteen walkway needed to be clear to be used as a walkway for staff. Harmon got agitated and stated "we are running canteen" and slammed the window shut on me.
>
> At approximately 0750 hours, EOP yard was released and Harmon had the window open again and 6 inmates on the walkway starting EOP canteen without the EOP officers on the yard or at the window. A Facility Control stated that Harmon comes almost every week day from 0700 after shift change at 1400 hours and that every once and a while she will leave at 1230 hours. At all times Harmon is in the canteen, Sapo is with her.

(Id. at 5-6.)

Like the rules violations reports discussed above, the memorandum above suggests that defendant Harmon permitted plaintiff to talk to inmates outside of the back window of the Canteen. This memorandum, as well as the rules violations reports, reflects defendant Porter's apparent frustration with Canteen Manger Harmon for allowing plaintiff to talk to inmates out of the back window, in violation of prison rules.

As stated above, while Canteen Manager Harmon may have permitted plaintiff to violate the rules prohibiting inmates from conversing behind the Canteen, the evidence demonstrates that defendant Porter was motivated to advance the legitimate penological goals of safety and security when she issued the 128-Chrono and rules violation reports. For these reasons, defendant Porter should be granted summary judgment.

B. Did Defendant Porter Issue the Disciplinary Write-ups Because of Plaintiff's Protected Activity?

Defendant does not dispute that plaintiff's conduct as a MAC representative, which included aiding inmates with their legal work, is protected by the First Amendment. Defendant moves for summary judgment on grounds that there is no evidence that she issued the disciplinary write-ups in retaliation for plaintiff assisting inmate Giraldes, as alleged in the complaint, i.e., plaintiff's protected activities were not a substantial or motivating factor behind her conduct.

The gravamen of defendant's argument that she did not issue the disciplinary write-ups based on plaintiff's assistance to inmate Giraldes is defendant's claim that the write-ups were factually true. Defendant also argues that plaintiff offers no causal connection or motive for why

13

defendant Porter would take particular issue with the antenna issue he assisted inmate Giraldes in litigating. Defendant argues that plaintiff does not explain why defendant would issue him three write-ups and then suddenly stop issuing them if she was truly motivated to retaliate against him. Finally, defendant argues that there is no evidence that she was even aware that plaintiff was helping inmate Giraldes with legal issues when she issued the write-ups.

In his opposition, plaintiff cites the following evidence as demonstrating defendant's retaliatory motive. First, plaintiff suggests that only Canteen Supervisor Harmon was authorized to issue disciplinary reports related to his job performance. Plaintiff offers no evidence to support this claim. The declarations of defendant Porter, R. Carter and Associate Warden Eldridge demonstrate that defendant Porter was authorized to issue the 128-Chrono and two rules violations reports to plaintiff.

Next, plaintiff contends that one day after plaintiff submitted a grievance regarding his removal from his job working in the Canteen, defendant Porter ordered that the MAC office be moved. (ECF No. 96 at 4.) Plaintiff alleges that the MAC office was returned to its original location three days later on October 11, 2011. (Id. at 4-5.) Plaintiff argues that the move of the MAC office is evidence of defendant's retaliatory motive.

In her declaration, defendant Porter states that she did not make the decision to have the MAC Room relocated out of the sally port area, and nor did she take it upon herself to move the MAC room. (ECF No. 77-6 at 4.) Defendant Porter states that moving the MAC room was a decision made by administrative staff due to concerns that inmate activity could not be properly monitored in the sally port because the area is hidden from plain sight. (Id.) Defendant Porter states that, to this date, the MAC room in A Facility has not been returned to its original location in the sally port area. (Id.) In his declaration, R. Carter states that neither he nor defendant Porter were permitted to move the location of the MAC room without authorization from a superior. (ECF No. 77-5 at 2.)

Plaintiff's claim that defendant Porter was somehow responsible for moving the MAC room is conclusory and unsupported by any admissible evidence. Accordingly, the MAC room move is not evidence of defendant's alleged retaliatory motive.

14

Plaintiff also argues that defendant had knowledge of inmate Giraldes's litigation regarding the antenna issue. (ECF No. 96 at 2-3.) Plaintiff cites Giraldes v. Porter, 12-cv-662 KJM EFB P, which named defendant Porter as a defendant.[3] (Id.) In 12-cv-662, inmate Giraldes alleged, in part, that defendant Porter retaliated against him for filing grievances regarding the antenna issue. (See 12-cv-662, ECF No. 11.) Case 12-cv-662 settled before the parties filed dispositive motions.

Plaintiff argues that in response to a request for admissions in the instant action, defendant Porter stated that she had no personal knowledge of whether inmate Giraldes filed an appeal regarding the antenna issue. (Id.; see also ECF No. 97-1 at 10.) Plaintiff argues that this response is not true, because defendant knew of inmate Giraldes' litigation based on case 12-662. Plaintiff argues that this misrepresentation demonstrates that defendant is not credible.

The court's function on a summary judgment motion is not to make credibility determinations or weight conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). However, even assuming defendant Porter had knowledge of inmate Giraldes' grievances and litigation regarding the antenna issue, plaintiff has not demonstrated that defendant had knowledge that he, plaintiff, was assisting inmate Giraldes. Moreover, even if plaintiff could show that defendant had knowledge of plaintiff's legal assistance to inmate Giraldes, plaintiff has not demonstrated that this protected conduct was a substantial or motivating factor behind defendant's issuance of the 128-Chrono and two rules violation reports.

As discussed above, it is undisputed that defendant Porter issued the write-ups after witnessing plaintiff communicate with inmates outside of the back window of the Canteen, in violation of prison rules. Based on these circumstances, plaintiff has not demonstrated that his alleged legal assistance to inmate Giraldes was a substantial or motivating factor behind the issuance of the write-ups. Accordingly, defendant should be granted summary judgment on this ground.

---

[3] Judicial notice may be taken of court records. Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126 (1981).

C. Did Issuance of the Disciplinary Write-ups Chill Plaintiff's Legal Activities?

Defendant moves for summary judgment on the grounds that issuance of the three write-ups did not chill plaintiff's First Amendment rights. Defendant argues that plaintiff has failed to explain how any of the write-ups affected his ability to continue performing his activities as a MAC representative or chairman, or prevented him from aiding inmates with their legal work.

In Rhodes, the Ninth Circuit held that an objective standard governs the chilling inquiry. See Brodheim v. Cry, 584 F.3d at 1271. "[A] plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" Id. (quoting Rhodes v. Robinson, 408 F.3d at 568-69.)

In the instant case, plaintiff alleges that he received one 128-Chrono and two rules violation reports. Plaintiff lost his job in the Canteen as a result of these write-ups. While plaintiff may not have been silenced by this action, the undersigned finds that a reasonable person may have been chilled. Accordingly, defendant should not be granted summary judgment on this ground.

D. Qualified Immunity

Defendant also moves for summary judgment on the grounds that she is entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

The Supreme Court has "mandated a two-step sequence for resolving government officials' qualified immunity claims." Pearson, 555 U.S. at 232, citing Saucier v. Katz, 533 U.S. 194 (2001)). "First, a court must decide whether the facts that a plaintiff has alleged...make out a violation of a constitutional right." Id. (citing Saucier, 533 U.S. at 201). This prong of the inquiry "mirrors the substantive summary judgment decision on the merits." See Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir. 2002). "If no constitutional right would have been violated

were the allegations established," then the officer is entitled to qualified immunity. Saucier, 533 U.S. at 201.

"Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson, 555 U.S. at 232. At step two, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

Because defendant did not violate plaintiff's constitutional rights, no further discussion of qualified immunity is warranted.

Accordingly, IT IS HEREBY ORDERED that plaintiff's motion to amend his opposition (ECF No. 98), construed as a motion to file a supplemental opposition, is granted;

IT IS HEREBY RECOMMENDED that defendant's motion for summary judgment (ECF No. 77, 95) be granted for the reasons discussed above.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: November 13, 2017

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Nun2775.sj